**Jimmy Lee KING et ux., Appellants,**

v.

**R. C. MATTESON et al., Appellees.**

**No. 371.**

Court of Civil Appeals of Texas.

Tyler.

Sept. 19, 1968.

Rehearing Denied Oct. 10, 1968.

John W. Warner, Pampa, for appellants.

Lemon, Close & Atkinson, R. D. Lemon, Perryton, for appellee First National Bank, Perryton, Tex.

DUNAGAN, Chief Justice.

The First National Bank, Perryton, Texas, appellee herein, sued appellants, Jimmy Lee King and wife, Evelyn King, in trespass to try title, alleging an oral contract to convey real estate, the taking of possession in good faith by the bank, and the expenditure of approximately $16,000.00 to complete a dwelling on the tract of land involved in this lawsuit. The bank also pleaded that Jimmy King was estopped to deny a superior equitable title in the bank

and, in the alternative, pleaded for an equitable lien securing its expenditure in excess of $16,000.00, and for foreclosure of such lien. The case was tried to the court without the aid of a jury. Judgment was entered vesting title to the property in the bank and the sum of $1,050.00 as rental for the use thereof. From this judgment, the appellants have duly perfected their appeal.

The appellants made no request for findings of fact and conclusions of law and none have been filed.

By Points of Error 1, 2 and 3, appellants contend the trial court erred in rendering judgment for the bank because (1) there was no evidence, (2) or insufficient evidence to establish a completed oral contract between Jimmy King and appellee, First National Bank, Perryton, Texas, and (3) the finding that there was a completed oral contract between Jimmy King and the bank would be against the great weight and preponderance of the evidence so as to be manifestly wrong and unjust.

In August of 1966 Jimmy King was a building contractor, doing business as King Construction Company in Perryton, Texas. At that time, he was constructing five houses in or near Perryton, Texas, including the house that is involved in this lawsuit. The bank was providing his interim construction finance and at that time, Jimmy King owed the bank about $103,000.00. Because of the poor health of Jimmy King's wife in the summer of 1966, he and his wife moved to Houston, Texas. The uncontradicted evidence shows at that time Jimmy King was broke. In fact, he testified that he "was about as broke as you could be."

On August 12, 1966, Jimmy King gave his brother, Lloyd King, a power of attorney, giving his brother the full power and authority, in his absence, to operate the business known as the King Construction Company which included the completion of the unfinished houses then under construction. Included in the houses was the house here involved. At that time, Jimmy King's

financial condition was such that he could not maintain the insurance policies in effect on these properties and notices of cancellation of insurance had been sent to him on several of the houses. The power of attorney was revoked by Jimmy King on September 15, 1966. During the existence of said power of attorney, Lloyd King attended the meeting of the creditors on August 30, 1966. The next meeting of the creditors on September 10, 1966, Jimmy King attended, representing himself and making certain representations in his own behalf. There were numerous conferences concerning the property between Lloyd King and the bank's attorney before the power of attorney was revoked.

On August 17 or 18, 1966, Jimmy King retained an attorney to file a bankruptcy petition for him. Such petition in bankruptcy was filed on August 22, 1966. It was dismissed on October 7, 1966, on the motion of petitioner, Jimmy King.

In September, 1966, the bank initiated a meeting of Jimmy King's creditors for September 10, 1966. This meeting was called by the bank in an attempt to make arrangements to complete the five unfinished houses and dispose of them. At this meeting, the bank offered to furnish funds with which to complete the five properties without any interest charge. This offer "pleased" Jimmy King, and he regarded it as valuable help at the time. The bank even made some payments on some first mortgage loans on some of Jimmy King's properties for several months. At that time, Jimmy King was interested in seeing that his creditors' losses were reduced or possibly eliminated.

At the meeting called by the bank in an attempt to make arrangements to complete the five unfinished houses and dispose of them, Jimmy King told the creditors present that he would be willing to turn over all of his assets except his pick-up, car, hand tools, equipment that he worked with, and his furniture. There is some testimony that Jimmy King made this offer

on the condition that all the creditors approve, which they did not. This testimony was rebutted by other evidence which the trier of the facts could have accepted in rendering judgment. He further agreed to convey his homestead and his offices to the bank as a trustee for his creditors at that time. Jimmy King testified he made this offer and agreement because he did not have the money to keep the payments up on them. He gave the following testimony:

"Q Now, you even agreed to convey your homestead and your offices to the bank as a trustee for your creditors at that time, did you not?

"A Yes, sir.

"Q Why did you agree to do this, Jimmy?

"A Because I didn't have the money to keep the payments up on them.

"Q All right. You couldn't make the payments on either your homestead or your warehouse and you were hoping that the bank would make those payments for you and hoping that they could be disposed of and an equity realized for the benefit of your creditors?

"A Yes sir."

There is testimony in the record that the bank, through its attorney, relied primarily on these express representations of Jimmy King. Also through its attorney it relied upon the numerous conferences of its attorney with Lloyd King.

When Jimmy King left Perryton in August, 1966, the house, which is the subject of this lawsuit, was at the "weathered-in point." The roof was on, it was sheet-rocked, taped and textured, had not been bricked, the trim had not been commenced, it had no carpet or linoleum, no light fixtures, no plumbing facilities in the kitchen or bathroom, and had not been painted. There was no insurance policy in effect on it. It was a "speculative" house in that King did not have a buyer for it, but was

building it contemplating selling it to someone when it was completed. Jimmy King was unable to complete this property, or any other of his properties. Several Mechanic's & Materialman's Liens had been filed by people working on the house but King had no way of paying them, and unless some arrangement had been made to complete this property, there would have been a foreclosure of liens and it would have been sold under a foreclosure sale. At the time of the creditors' meeting, King knew that the bank would complete the houses, including the house here in controversy, and attempt to make a disposition of them.

In fact, Jimmy King testified that he "wanted" the bank to furnish the funds with which to finish his unfinished houses. The bank did so, but on or about December 31, 1966, Jimmy King and his family moved back to Perryton and into the house here in question and was living there at the time of trial.

At the time Jimmy King filed his bankruptcy petition, he had an unrecorded deed to the property here in question. The deed was dated March 25, 1966, filed for record. November 28, 1966, and had been in his possession since shortly after its execution. It was in his possession at the time he signed his sworn bankruptcy petition, but it was not listed on the petition.

The bank's attorney was unaware that there was any dispute about the property here involved until after Jimmy King filed a homestead designation on December 16, 1966. In this connection, Jimmy King testified:

"Q Actually, Mr. King, you never did at anytime during the hearings in September or the conferences during September or at any other time tell me that you were going to come back up here and claim that Ash Street home as a homestead, did you? (Ash Street property is the property here involved.)

"A No.

"Q Actually, Jimmy, isn't it a fact that you are claiming this property as a homestead and your moving back to Perryton was an afterthought after you got tiffed at the bank on some matters, isn't that true?

"A Well, true.

"\* \* \*

"Q You never had any intent whatsoever until there about Christmas-time in December?

"A To move back?

"Q To move back?

"A That's when I actually decided to move back.

"Q And there from about the first of November on, when your father told you that the house was being worked on, you knew that construction was actually taking place, didn't you?

"A I knew that some was taking place, right.

"Q Do you recall this question and answer at the prior hearing, Question: 'When did you first decide to move back?' Answer: 'When?' Question: 'Could you give us an approximate time?' Answer: 'The approximate time was about, I would say, 5 days to a week, maybe 2 weeks, before I moved back.' Question: 'Would this have been before or after you filed your Homestead Affidavit?' Answer: 'It would be after I filed my Homestead because I was just going to let it set there. I really wasn't even going to move back into it at all, and then, like I said, I was talking to another lawyer down there, and he said, "Jimmy, you better move back into it because that's the way you will have to prove up your homestead." Whether that's right, or not, I don't know.' Do you remember that testimony?

"A Yes, sir."

There is other testimony supporting the judgment of the trial court, but it would unduly lengthen this opinion to detail it here.

■ In a case tried without a jury, where appellant did not request the trial court to file findings of fact and conclusions of law, and none appear in the record, we, as the reviewing court, must test the validity of the judgment on the assumption that the trial court found every disputed fact in such a way as to support the judgment. Construction And General Labor Union v. Stephenson, 148 Tex. 434, 225 S.W.2d 958 (1950); Old Nat. Life Ins. Co. v. Guest, 163 S.W.2d 241 (Tex.Civ. App., Texarkana, 1942, writ ref., w. o. m.); Tregellas v. Jake's Casing Crews, Inc., 376 S.W.2d 792 (Tex.Civ.App., Amarillo, 1964, writ ref., n. r. e.).

■ We think this case clearly falls within the doctrine enunciated by our Supreme Court in Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 1116, 15 A.L.R. 216 (1921), where the court said:

"From an early time it has been the rule of this court, steadily adhered to, that to relieve a parol sale of land from the operation of the statute of frauds, three things were necessary: 1. Payment of the consideration, whether it be in money or services. 2. Possession by the vendee. And 3. The making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced. * * *"

See Maloy v. Wagner, 147 Tex. 486, 217 S.W.2d 667 (1949); Davis v. Crockett, 398 S.W.2d 302 (Tex.Civ.App., Dallas, 1965, n. w. h.).

The most recent expression of these rules insofar as we have been able to determine is found in Hidalgo v. Lechuga, 407 S.W.2d 545 (Tex.Civ.App., El Paso, 1966, writ ref., n. r. e.) where the court cited with approval the rules set out in *Hooks* and upheld an oral agreement to convey real estate on the ground that the evidence supported the jury's findings that (1) there was an agreement to convey, (2) the grantee took possession and paid the consideration, and (3) erected valuable and permanent improvements.

Where the three elements as stated in the Hooks case are present, the courts of this state have consistently and repeatedly disregarded the statute of frauds. Hudgins v. Thompson, 109 Tex. 433, 211 S.W. 586 (1919); Evans v. Ingram, 288 S.W. 494 (Tex.Civ.App., Waco, 1926, n. w. h.).

Paramount in all the cases where the courts have upheld the parol agreement to convey is a judicial recognition that failure to enforce an oral agreement could result in fraud—which the statute of frauds was supposed to prevent. See 4 Pomeroy, Equity Jurisprudence (4th ed. 1918-1919), Sec. 3346, which states: "The ground upon which the remedy in such action exists is that of equitable fraud. It would be a virtual fraud for the defendant, after permitting acts of part performance, to interpose the statute as a bar to the plaintiff's remedial relief." 6 T.L.R., page 53.

In Ponce v. McWhorter, 50 Tex. 562, 579 (1879), the court said: "The ground upon which such verbal sales are enforced, notwithstanding the statute, is the prevention of fraud."

■ We have examined this record in the light of the rule announced by our Supreme Court in In re: King's Estate, 150 Tex. 662, 244 S.W.2d 660, and find ample evidence to support the judgment and we further find that the judgment is not so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

We have considered all of appellants' Points of Error. They are overruled.

Judgment affirmed.